IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| **STEVEN H.**[1], | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) Civil Action No. 7:21cv597 |
| | ) |
| **KILOLO KIJAKAZI,** | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION[2]

Plaintiff Steven H. ("Steven") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding him not disabled and therefore ineligible for Supplemental Security Income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. §§ 1381-1383f. Steven had previously sought judicial review of a final decision denying his claim for disability benefits and this court remanded his case to the Commissioner for further administrative proceedings. Steven alleges that the Administrative Law Judge ("ALJ") erred by failing to properly: (1) weigh the medical opinions in the record; and (2) perform a function-by-function analysis, particularly regarding Steven's limitation in social functioning and concentration, persistence, and pace. I conclude that the ALJ failed to properly weigh the medical opinions in the record and substantial evidence does not support the ALJ's decision. Accordingly, I **GRANT in part** Steven's motion for summary judgment (Dkt. 17), **DENY** the

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

[2] This case is before me by consent of the parties pursuant to 28 U.S.C. § 636(c). Dkt. 7.

Commissioner's motion for summary judgment (Dkt. 19), and **REVERSE AND REMAND** this case for further administrative proceedings consistent with this opinion.

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Steven failed to demonstrate that he was disabled under the Act.[3] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

However, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s]

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

2

meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" because the court is "left to guess [at] how the ALJ arrived at his conclusions"); see also Monroe v. Colvin, 826 F.3d. 176, 189 (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often) (citation omitted).

## CLAIM HISTORY

Steven filed for SSI on March 10, 2016, claiming that his disability began on this date[4], due to joint pain, multiple sclerosis, post-stroke syndrome (memory and emotional), depression, headaches, severe fatigue, muscle weakness, pain, and anxiety.[5] R. 82, 274. In July 2018, after holding a hearing, ALJ David S. Lewandowski issued an unfavorable ruling denying Steven's claim. R. 11–30. The Appeals Council denied Steven's request for review and Steven filed a civil action in this court challenging that decision. See Steven H. v. Commissioner, Case No. 7:19cv472. This court, on the Commissioner's motion to remand, remanded Steven's case for further administrative proceedings on January 10, 2020.[6] R. 665. The Appeals Council then vacated ALJ Lewandowski's first decision, sending the case to ALJ Lewandowski again for rehearing. R. 666–670. In remand, the Appeals Council directed further evaluation at step five,

---

[4] At the hearing, Steven amended his alleged onset date from November 1, 2012 to March 10, 2016, his protective filing date, and withdrew his request for a hearing on his application for disability insurance benefits. R. 566–67.

[5] Steven was 32 years old on the date his application was filed and 37 years old on the date of the ALJ's 2021 opinion, making him a younger person under the Act. R. 81.

[6] In the Motion to Remand, the Commissioner indicated, "Upon further review of this matter, the Appeals Council has determined that further consideration and development of record, and further evaluation of Plaintiff's claim are warranted." R. 662.

with supplemental vocational expert evidence to resolve an apparent conflict between the RFC and the Dictionary of Occupational Titles ("DOT"), an explanation of the RFC limitation of being off-task 10 percent of the workday, and additional evaluation of Seven's mental impairments and maximum RFC. R. 668–69.

ALJ Lewandowski held another hearing in November 2020. R. 592–625. Counsel represented Steven at the hearing, which included testimony from vocational expert Gerald Wells. The ALJ issued a second unfavorable decision on January 12, 2021, analyzing Steven's claims under the familiar five-step process[7] and denying his claim for benefits. R. 566–84. The ALJ found that Steven suffered from the severe impairments of multiple sclerosis, stroke, carotid artery dissection, headaches, seizures, neurocognitive disorder, mood disorder, attention deficit / hyperactivity disorder, personality disorder with cluster B traits, intermittent explosive disorder, and persistent depressive disorder. R. 569. The ALJ determined that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. Id. The ALJ specifically considered listing 11.02 (epilepsy), listing 11.04 (vascular insult to the brain), 11.09 (multiple sclerosis), listing 12.02 (neurocognitive disorders), listing 12.04 (depressive, bipolar, and related disorders), listing 12.08 (personality and impulse control disorders), and listing 12.11 (neurodevelopmental disorders). The ALJ also considered Steven's migraines pursuant to SSR 19–4p. The ALJ found that regarding his mental impairments, Steven had moderate limitations

---

[7] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

in interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself, and a mild limitation in understanding, remembering, or applying information. R. 571–72. The ALJ concluded that Steven retained the residual functional capacity ("RFC") to perform a limited range of light work. R. 572. Specifically, Steven can frequently perform postural activities, but cannot climb ladders, ropes, or scaffolds, and should avoid concentrated exposure to temperature extremes and vibrations, and exposure to industrial hazards and loud noises such as heavy traffic and bright lights (though an office setting is okay). Steven can understand, remember, and apply instructions with a reasoning level of one, and can occasionally interact with coworkers and supervisors, but should work independently, not in tandem with others, and have no interaction with the general public. Steven can adapt to occasional changes in the customary workplace setting and will be off task ten percent of the day. The ALJ determined that Steven was unable to perform his past relevant work as a painter and landscape laborer, but that he could perform jobs that exist in significant numbers in the national economy, such as housekeeper, garment folder, and marker II. R. 582–83. Thus, the ALJ determined that Steven was not disabled. R. 583. Steven filed for direct review of the unfavorable decision in this court.[8] See 20 C.F.R. § 404.984(d); Massey v. Saul, No. 1:19 CV 152 WCM, 2020 WL 4569606, at *1 (W.D.N.C. Aug. 7, 2020) (noting that "When a case is remanded by a federal court, the subsequent decision of the ALJ will become the final decision of the Commissioner unless the Appeals Council assumes jurisdiction over the case").

---

[8] The Notice of Decision – Unfavorable, dated May 19, 2020, from the ALJ states:

> If you do not file written exceptions and the Appeals Council does not review my decision on its own, my decision will become final on the 61st day following the date of this notice. After my decision becomes final you will have 60 days to file a new civil action in Federal district court. You will lose the right to a court review if you do not file a civil action within the [time period provided].

R. 563–65.

## ANALYSIS

Steven alleges that the ALJ failed to a properly weigh the medical opinions in the record and perform a proper function-by-function analysis, particularly regarding Steven's limitation in social functioning and concentration, persistence, and pace.

### A. Medical History Overview

Steven has a history of multiple sclerosis, seizures, and mental health complaints. As the Commissioner points out, most of his treatment records relate to his multiple sclerosis and seizures. In April 2015, Steven was assessed with relapsing remitting multiple sclerosis, with complaints of blurred vision, physical and emotional fatigue, and stress and anxiety, as well as dissection of carotid artery, memory loss, and fatigue. R. 383, 389, 392. On physical exam, he had normal muscle tone, strength, and coordination and his treating neurologist diagnosed memory loss, writing, "he has fatigue and cognitive impairment, which are likely secondary to his psychiatric conditions, given the mild lesion burden noted on his most recent MRI scan of the brain." R. 383–84. In September 2017, Steven presented to the emergency room after having a seizure. R. 499. As recommended, he followed up with a neurologist the following month and had a normal EEG. R. 553–55.[9] R. 554. Steven subsequently had several additional grand mal seizures and began a treatment regimen, which effectively managed his seizures. R. 782, 805.

1. Medical Opinions

In June 2016, shortly after Steven's alleged onset date, Rex Head, M.D. performed a physical consultative exam, including a neurological exam. R. 445–49. Dr. Head noted Steven's

---

[9] Steven had been diagnosed with multiple sclerosis prior to this visit; however, it appears the doctor had not reviewed those records, as he indicated he would need "records from [Steven's] past neurologists" as well as his brain MRI scans to establish a diagnosis of multiple sclerosis. R. 554. The doctor wrote he "did not treat a single seizure with a normal EEG" and would "have to establish a diagnosis of multiple sclerosis before [he] would treat him for it."

history of multiple sclerosis, including an MRI in November 2014, showing a mild lesion, and complaints of intermittent blurred vision, headaches, and fatigue. R. 445. Because of Steven's multiple sclerosis with chronic fatigue and weakness, Dr. Head imposed lifting and carrying restrictions, as well as walking restrictions.[10] R. 449. The ALJ gave Dr. Head's opinion little weight.

In July 2016 state agency doctor Barry Cusack, M.D. reviewed the record and determined that Steven was capable of a full range of light work. R. 90. On reconsideration, in September 2016, state agency doctor Robert Vestal, M.D. determined he was capable of a limited range of light work, including postural and environmental limitations. R. 109. The ALJ gave some weight to Dr. Cusack, and significant weight to Dr. Vestal. State agency psychologist, Michael Dennis, Ph.D. reviewed the record in July 2016 and found severe impairments of multiple sclerosis, cerebral trauma, anxiety disorders, and affective disorders, and mild restrictions in activities of daily living, and moderate limitations in maintaining social functioning, maintaining concentration, persistence, or pace, and no repeated episodes of decompensation. R. 87. On reconsideration in September 2016, state agency psychologist Barney Greenspan, Ph.D. came to the same conclusions, with an additional severe limitation of substance addiction disorders. R. 106–107. The ALJ gave significant weight to both the state agency psychologists. R. 578.

In July 2016, Gerald Gardner, Ph.D. performed a psychological consultative assessment. R. 452–59. Dr. Gardner performed a mental status examination and found diagnostic impressions of an unspecified mood disorder and unspecified personality disorder with cluster B traits

---

[10] Dr. Head limited Steven to lifting less than 80 pounds at one time, or less than 40 pounds repeatedly, and carrying less than 30 pounds at once or 30 pounds repeatedly and walking less than half a mile on flat ground without a break and less than two miles in an eight-hour workday. R. 449.

prominent, ADHD, and a probable mild neurocognitive disorder.[11] R. 457. Dr. Gardner noted that medical records document multiple sclerosis and dissection of carotid artery, memory loss, fatigue, headaches, and substance use disorder (marijuana) in reported remission. Id. Dr. Gardner wrote the following summary impression:

> Steven's history of multiple sclerosis, reported repeated episodes of dramatic loss of consciousness, and premorbid history of ADHD with learning problems[,] all combined to put him at significant risk for cognitive impairment. I question the validity of his performance on the cognitive portion of the mental status examination today. His irritability, and probably oppositional behavior, interfered. This may be a more valid sample of his social difficulties than his cognition, although he likely does have some level of cognitive impairment.

R. 57. Related to this irritability, Dr. Gardner noted Steven "appears irritable and oppositional. He likely would have considerable difficulty getting along adequately with coworkers and supervisors." R. 459. The ALJ gave Dr. Gardner's opinion little weight. R. 24.

In October 2020, Robert C. Miller, Ed.D., L.C.P., performed another consultative psychological evaluation. R. 860–71. Dr. Miller wrote that "[w]hile there does not appear to be an effort on [Steven's] part to deliberately distort the clinical picture, the test results involve substantial distortion." R. 864. Dr. Miller concluded that Steven "cooperated with the examination processes and procedures to the best of his ability" and concluded the results were valid and "representative of his psychological functioning." R. 865. Dr. Miller indicated Steven has symptoms of Major Depressive Disorder, Intermittent Explosive Disorder, and Persistent Depressive Disorder (Dysthymia), with a prognosis of poor "in terms of improvement in his functioning. . . ." R. 866. Dr. Miller concluded that "[e]fforts toward getting him back to work are likely to be unsuccessful and likely would increase his anger and trigger episodes of rage potentially placing himself and others at risk." R. 866. In completing a Mental Impairment

---

[11] Steven has a ninth-grade education, with special education services throughout his schooling. R. 444-45.

8

Questionnaire, Dr. Miller found a number of extreme limitations, and found Steven would be off task more than 15% of the time and miss more than four days per month. R. 870–71. The ALJ gave Dr. Miller's opinion little weight.

In October 2020, Martha Sharitz, PA-C, noted several work-preclusive limitations, including that Steven would be absent more than four days a month and writing, "It is my clinical opinion that [Steven] would have extreme difficulty with maintaining employment, secondary to his depression, mood swings, MS, anger and paranoia bouts." R. 840.

### B. ALJ's Consideration of Medical Opinions

As Steven points out, regarding his mental impairments, the ALJ gave "significant weight" to both state agency psychologists, and "little weight" to the treating and examining sources, including three consultative examiners and a treating nurse practitioner. Steven argues that the ALJ failed to provide adequate reasons for discounting these opinions, stating that the ALJ failed to adequately explain why the state agency doctors opinions merited more weight, especially when the examining and treating sources all found "far greater limitations" in social functioning and concentration, persistence, and pace. The Commissioner counters that the ALJ's assessment of the opinion evidence is supported by substantial evidence.

For claims like Steven's, filed prior to March 27, 2017, the standards for evaluating medical opinions are in 20 C.F.R. § 404.1527.[12] The regulations require an ALJ to evaluate the weight given to a non-treating source, such as a consultative evaluator, considering three factors: (1) supportability in the form of the quality of the explanation provided and the amount of

---

[12] The social security regulations regarding the evaluation of medical opinion evidence have been amended for claims filed after March 27, 2017. See 20 C.F.R. §§ 404.1520c, 416.920c (setting out rules for claims filed on or after March 27, 2017, including that no specific evidentiary weight will be given to any medical opinions). Previously, the regulations included a treating physician rule, according controlling weight to the opinions of the claimant's treating sources, if the ALJ finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).

relevant evidence substantiating it; (2) consistency with the record as a whole; and (3) the source's specialization. Brown v. Comm'r Soc. Sec. Admin., 873 F.3d 251, 256 (4th Cir. 2017); see also 20 C.F.R. § 404.1527(c)(3)-(5) (2020) (providing that the ALJ may accord a consultative examiner's opinion less weight when is not well supported by medically acceptable clinical and laboratory diagnostic techniques or it is inconsistent with other substantial evidence of record). The regulation provides that the ALJ "will evaluate every medical opinion" presented to him, "[r]egardless of its source." Id. § 404.1527(c). Generally, however, more weight is given "to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you." Id. § 404.1527(c)(1). Of course, the consultative examiners all examined Steven, while the state agency doctors did not.

The ALJ did not properly consider the required factors, or the record, in determining that the consultative doctors all merited little weight.[13]

Consultative Psychologists Dr. Gardner and Dr. Miller

To justify discounting Dr. Gardner's opinion, the ALJ wrote that he "gives little weight to the consultative examiner [Dr. Gardner], as [Dr. Gardner] noted [Steven's] effort was unclear

---

[13] Steven also argues that the ALJ failed to properly consider Ms. Sharitz's opinion. As a physician assistant, she was not an acceptable medical source as defined by the applicable version of the Act. 20 C.F.R. §§ 404.1513, 416.913. However, an ALJ has a duty to consider all of the evidence available in a claimant's case record, including evidence provided from medical sources who are not "acceptable medical sources" such as physician assistant, though these opinions are not entitled to any particular weight. Ingle v. Astrue, 1:10CV141, 2011 WL 5328036, at *3 (W.D.N.C. Nov. 7, 2011) (citing Social Security Ruling ("SSR") 06–03p, 2006 WL 2329939 (SSA)(Aug. 9, 2006); 20 CFR §§ 404.1513(d), 416.913(d)). To determine the weight given to the opinion of a source who is not an "acceptable medical source" as defined by the Act, the ALJ should consider: (1) the length of time the source has known the claimant and the frequency of their contact; (2) the consistency of the source's opinion with the other evidence; (3) the degree to which the source provides supportive evidence; (4) how well the source explains his or her opinion; (5) whether the source has an area of specialty or expertise related to the claimant's impairments; and (6) any other factors tending to support or refute the opinion. Beck v. Astrue, 3:11–CV–00711, 2012 WL 3926018, at *12 (S.D.W. Va. Sept. 7, 2012) (citing SSR 06–03p). The ALJ primarily considered the consistency of Ms. Sharitz's opinion with the objective medical findings related to Steven's multiple sclerosis symptoms, seizures, and headaches (R. 581), but did not explain the consistency of her opinion related to his mental health complaints and treatment. On remand, the ALJ should also explain his evaluation of Ms. Sharitz's opinion that Steven's depression, mood swings, anger and paranoia would made it "extremely difficult" for him to maintain employment. R. 540, 851.

and [he] was unable to make a determination as to whether limitations existed in many areas." Id. From this explanation, I cannot be sure the ALJ adequately considered Dr. Gardner's opinion on Steven's social interaction issues, which Dr. Gardner addressed distinctly from Steven's cognition issues, but which the ALJ confusingly lumped together. The ALJ used Dr. Gardner's statement about Steven's effort to discount his entire opinion – when Dr. Gardner was actually making a point to discount his *own* results for the cognitive portion of the test. See Arakas v. Comm'r, Soc. Sec. Admin., 983 F.3d 83, 98 (4th Cir. 2020) (remanding and noting that the ALJ erred by selectively citing from the evidence of record, when the doctor's notes were "more nuanced" than represented by the ALJ).

Indeed, despite Steven achieving a score of 11/30 on his mental status examination, when scores of 1-20 are in the range of dementia, Dr. Gardner wrote:

> Steven's history of multiple sclerosis, reported repeated episodes of dramatic loss of consciousness, and premorbid history of ADHD with learning problems all combined to put him at significant risk for cognitive impairment. I question the validity of his performance on the cognitive portion of the mental status examination today. His irritability, and probably oppositional behavior, interfered. This may be a more valid sample of his social difficulties than his cognition, although he does have some level of cognitive impairment.

R. 457. Thus, I am left to guess why the ALJ discounted Dr. Gardner's statement about Steven's social interaction issues, or whether he fully considered it in crafting the RFC.[14] Dr. Gardner emphasized several times that Steven would be distracted by others, and would struggle with social interaction, writing:

> [Steven] does appear likely vulnerable to distraction by the presence of others. He emphasizes irritability and appears irritable and oppositional. He likely would have considerable difficulty getting along adequately with coworkers and supervisors.

---

[14] The ALJ also referenced Steven's lack of mental health treatment, including medication and counseling, and his periodic abnormal mental status examinations, but it is not clear how these affect the weight given to Dr. Gardner. R. 579. The ALJ did not address evidence in the record indicating that counseling was unlikely to help Steven. R. 866.

11

R. 458–59.

Akin to his reasons for discounting Dr. Gardner, to justify discounting Dr. Miller's opinion, the ALJ wrote:

> While [Dr. Miller] opined marked and extreme limitations in many areas, as well as the need for excessive absences and time off task, he also noted a significant distortion in [Steven's] PAI.

R. 579. However, again, Dr. Miller himself pointed out the distortion, and considered it in his diagnostic impressions and recommendations. Dr. Miller noted, "While there does not appear to be an effort on [Steven's] part to deliberately distort the clinical picture, the test results involve substantial distortion." R. 864. However, Dr. Miller still found that Steven "cooperated with examination processes and procedures to the best of his ability" and that the results of the evaluation were "valid and representative of his psychological functioning." R. 865. Dr. Miller found that, while medication may help Steven, he is unlikely to benefit from counseling, his prognosis for improvement is "poor," and efforts at returning to work would likely be unsuccessful and increase his anger, triggering episodes of rage and potentially placing himself and others at risk. R. 866. Consistent with this, at the hearing, Steven testified that he had either gotten angry and walked off all his previous jobs, or been fired, stating "I'd get in arguments with people, coworkers, supervisors . . . and they felt . . . I was a danger to the people around me, so they let me go or, if I didn't walk off a job, quit."[15] R. 604. He also testified that he seldom, if ever, left his home, and continued to have paranoid thoughts. R. 603. As Steven points out in his brief, the vocational expert testified that an individual who had outbursts and cursed or screamed on the job or made coworkers feel unsafe would be unable to maintain a job. R. 617–19.

---

[15] In a function report Steven likewise reported he was fired or laid off from "every job he ever had" because of problems getting along with people. R. 322.

The only other explanation the ALJ offered for discounting Dr. Miller's opinion was a general statement that "as discussed below, the record is not consistent with those types of limitations." R. 579. The ALJ did not cite to any specific records to support this conclusion.[16] On the next page, the ALJ does refer to Steven's reported ability to watch television, and "at times . . . perform cooking, cleaning, and shopping" as well as "generally interact normally with his treating practitioners"[17] and live with his father "without issues." R. 580. However, in a different part of the opinion, the ALJ indicated that Steven "later denied cooking or doing any chores, or driving." R. 573. Steven testified at the hearing that he lived with his father, just the two of them, and that he struggled with anger and irritability, including lashing out at his dad. R. 603. While the ALJ wrote Steven "reported doing a variety of daily tasks," the only task listed to support this is watching television. Id. At his 2016 consultative evaluation, Steven indicated he did not do chores, cook, socialize, or drive, and the consultative examiner determined he could not reliably manage his own funds.[18] R. 454.

Here, contrary to both consultative psychologists' assessments of serious difficulties interacting with coworkers and supervisors, even to the point of putting others at risk, in the domain of interacting with others, the ALJ finds a moderate limitation, and imposes an RFC that permits occasional interaction with both coworkers and supervisors, where occasional interaction

---

[16] In contrast, Dr. Miller cited to Steven's health history including "ischemic strokes, childhood head injury, and [multiple sclerosis]" as well as records showing headache, fatigue, memory loss, chronic pain, major depression, anxiety disorder, and a possible neurocognitive and personality disorder, as well as a "history of mood swings and extreme irritability."  R. 861.

[17] As discussed below, I am left with questions about the ALJ's conclusion that Steven "generally interacted normally" with his doctors, when he had three outbursts at medical offices during the relevant period, including one resulting in a complete ban.

[18] Steven did indicate he would watch television but would "get overwhelmed by that" and "might go outside and sit." R. 454.

13

is "up to one-third of the day." R. 571–72, 622. In support, the ALJ problematically concluded that Steven "generally interacted normally with all treating practitioners," despite what the ALJ described as "an incident with a receptionist" and being "banned from a dental clinic." The "incident with a receptionist" was described in the medical record by the doctor as:

> [Steven] had an appointment to see me this morning, came into the office, was agitated, angry, irritable, throwing his chart toward the receptionist, then storming out of the office before being seen, leaving his father, with whom he lives, in the office . . . .

R. 807. Likewise, on September 29, 2020, Steven was dismissed from the dental practice of Community Health Center of the New River Valley due to his "inappropriate behavior" and informed in a letter they would no longer see him at any of their locations. R. 842. The ALJ failed to reference here Steven's behavior in September 2017, where his medical provider described him as "guarded and paranoid" and noted he cursed at staff before leaving abruptly, though the ALJ mentioned the incident elsewhere in his opinion. R. 541, 575.[19] I am left to guess what evidence in the record, specifically, the ALJ used to discount Dr. Gardner's and Dr. Miller's opinions, especially because the ALJ failed to adequately address both Dr. Gardner's explanation that he had discounted his own results related to cognitive testing, and Dr. Miller's explanation related to distortion.

<u>Dr. Head</u>

The ALJ also gave little weight to the consultative examiner, Dr. Head, on the grounds that the physical limitations found by Dr. Head were "not supported by the consultative examiner's own findings of a virtually normal examination."[20] R. 579–80. The ALJ wrote that,

---

[19] Steven also had some difficulty controlling his emotions at his 2018 in-person hearing with the ALJ, including expressing that he felt like he was being interrogated, stating that he wanted be left along, and cursing. 49, 52, 54–55. He testified that he had daily problems with anger, which he resolves by going to lay down or hide in a closet. R. 50. He did not lose control of his emotions during this second hearing, which occurred by telephone.

[20] The Commissioner contends that Dr. Head's walking limitations, of less than two miles in an eight-hour day, are "not facially at odds with the ALJ's decision that [Steven] could perform light exertional work such as a

"[a]lthough [Steven] had a history of multiple sclerosis with chronic fatigue and weakness, Dr. Head admitted there was nothing on the examination to confirm these impairments. R. 508. This explanation, however, fails to take into account Dr. Head's review of Steven's medical history, including records showing pain that "comes and goes," a diagnosis of multiple sclerosis, and reports of "persistent physical and emotional fatigue," which Dr. Head correctly considered in forming his conclusions. Dr. Head clearly recognized that Steven's physical exam did not show fatigue and weakness, even pointing out that he lifted himself easily onto the tall exam table with his arms but had weakness with break away when testing. R. 449. Dr. Head plainly stated that, because of Steven's diagnosis of multiple sclerosis, he gave him lifting and walking limitations. In short, the ALJ failed to explain why he discounted Dr. Head's opinion based on a lack of findings on examination, when Dr. Head clearly stated he imposed limitations based on Steven's history of multiple sclerosis and not on symptoms during the examination. Earlier in the opinion, the ALJ notes that an imaging study showed findings consistent with multiple sclerosis and that Steven has complained on fatigue and weakness but has not been "entirely compliant with his prescription regimen." R. 579. However, despite acknowledging Steven's difficulty paying for his multiple sclerosis mediation, the ALJ did not consider whether his compliance may have been affected by the ability to afford his medication.[21] R. 575. See SSR 96-7p, 1996 WL 374186,

---

garment folder or marker" which include a combination of standing/walking up to six hours. D's Br. at 18, Dkt. 20. Despite the Commissioner's contention that "facially these jobs . . . occur at a single location without extensive walking between distances" these limitations were simply not considered by the ALJ, and I cannot determine whether they would impact Steven's ability to do these specific jobs. In fact, at least one court has reasoned that a limitation to walking two miles in a day is actually more consistent with sedentary work than light work. See Hughes v. Colvin, No. 4:14-CV-02046-RBH, 2015 WL 5437139, at *5 (D.S.C. Sept. 15, 2015) (noting that the ability to stand up to 60 minutes or walk up to two miles equals about a maximum of standing or walking of 60 or 90 minutes, which is more consistent with an RFC of sedentary work, requiring standing and walking for "no more than about two hours").

[21] Steven reported to Dr. Hawley that he had a prescription for Tecfidera his multiple sclerosis, but "when he brought it to a pharmacy, he learned that it would cost him $7,000 a month, which he cannot afford." R. 554.

15

at *7 (instructing that the ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide"); Kenedy v. Saul, 781 F. App'x 184, 188 (4th Cir. 2019) (citing SSR 96-7p and finding the ALJ erred by failing to account for the claimant's statement to the consultative examiner that she could not afford to see a rheumatologist due to lack of insurance, or her testimony that she could only afford the lupus medication after qualifying for Medicaid).

I recognize that it is not my function to conduct a blank slate review of the evidence by reweighing conflicting evidence, determining credibility, or substituting my judgment for the ALJ's when "reasonable minds could differ." See Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012); Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). In fact, I am precluded from doing so; it is the duty of the ALJ to explain the basis for his opinion. Here, however, the ALJ did not adequately explain his decision to discount the consultative doctor's opinions on Steven's limitations, including because he did not adequately consider the factors outlined in 20 C.F.R. § 416.927(c)(2), or justify his decision with specific reasons, such as a detailed discussion of contrary evidence. See Monroe, 826 F.3d at 189 (emphasizing that the ALJ must "'build an accurate and logical bridge from the evidence to his conclusion') (quotation omitted); Patterson v. Commissioner of Social Security, 846 F.3d 656 (4th Cir. 2017) (admonishing ALJ's to "show your work"). Accordingly, I conclude that substantial evidence does not support the ALJ's decision to discount these opinions.

Because I find that remand is warranted based on the ALJ's failure to adequately explain his decision to discount the opinions of the consultative physicians, Steven's additional

allegations of error will not be decided. See Boone v. Barnhart, 353 F.3d 203, 211 n.19 (3d Cir. 2003) (remanding on other grounds and declining to address claimant's additional arguments).

## CONCLUSION

For these reasons set forth above, I **GRANT in part** Steven's motion for summary judgment, **DENY** the Commissioner's motion for summary judgment this case, and **REMAND** this matter to the Commissioner for additional consideration under sentence four of 42 U.S.C. § 405(g).

Entered:  November 30, 2022

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge